**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel*. KERMITH SONNIER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-1065 |
| | § | |
| THE STANDARD FIRE INSURANCE | § | |
| COMPANY, *et al*., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is the latest in a series of *qui tam* actions alleging that insurers and adjusters committed fraud in responding to hurricane damage claims.  The relator, Kermith Sonnier, alleges that the defendants prepared and submitted inflated claims on flood-insurance policies backed by the Federal Insurance Administration's ("FIA") National Flood Insurance Program ("NFIP"), while reducing claims paid on privately backed wind-insurance policies, in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–32.  The United States declined to intervene.  (Docket Entry No. 10).

The defendants have moved to dismiss Sonnier's claims.  They argue that the court lacks subject-matter jurisdiction because: the claims were the subject of prior disclosures and Sonnier is not an original source; Sonnier was not the first to file claims against the defendants; and Sonnier did not plead his fraud claims with sufficient particularity.  (Docket Entry No. 82).  Allstate Insurance Company; Pilot Catastrophe Services, Inc.; Fidelity National Financial, Inc.; Fidelity National Indemnity Insurance Company; Colonial Claims Corporation[1]; and Brown & Brown, Inc.

---

[1]  Sonnier refers to this defendant as "Colonial Claims Company."  In its own filings and in its corporate disclosure statement, Colonial refers to itself as "Colonial Claims Corporation."  (*See* Docket Entry Nos. 74,

also filed supplemental memoranda asserting additional grounds for dismissing the claims against

them.  (Docket Entry Nos. 84, 85, 86, 88).  Sonnier filed a consolidated response, (Docket Entry No.

106), and the defendants replied, (Docket Entry Nos. 107, 108, 110, 111, 112).  The court held a

hearing on April 7, 2014, at which the parties presented oral argument.  (Docket Entry No. 120).

At the court's request, the parties submitted supplemental briefs on the effect of the Supreme Court's

grant of *certiorari* in *United States ex rel. Carter v. Halliburton Company*, 710 F.3d 171 (4th Cir.

2013), *cert. granted*, 82 U.S.L.W. 3010, 2014 WL 2931840 (U.S. July 1, 2014) (No. 12-1497).

(Docket Entry Nos. 124, 125).

Based on the pleadings; the motions, responses, and replies; the record; and the applicable

law, the court grants the defendants' motion to dismiss Sonnier's claims. (Docket Entry No. 82).

The reasons are explained in detail below.

I.      **Background[2]**

        A.      **The WYO Insurance Program**

        The federal government administers a Write Your Own ("WYO") insurance program through

the NFIP to provide flood-insurance policies to individuals.  Under the WYO program, private

insurers issue NFIP-backed flood-insurance policies to individuals, who pay the federal government

the premium through the issuing private insurer.  These private insurers are called "WYO insurers"

when they administer NFIP-backed flood policies.  After a flood event, the WYO insurers receive

and adjust claims and submit them to the federal government for payment.  In exchange, the WYO

---

86).

[2]  The relevant facts are drawn primarily from Sonnier's complaint.  (Docket Entry No. 1, ("Complaint")).
The court also takes judicial notice of the exhibits in the defendants' request for judicial notice.  (Docket
Entry No. 87).

insurers receive part of the policy premiums, a fee for processing claims, and an adjuster fee based on the amount of each settled claim.  (Docket Entry No. 1, Complaint, ¶¶ 19–20).

Private insurance companies hire adjusters to inspect each insured property, determine whether and how much damage the policy covers, and prepare a formal written loss estimate. Adjusters frequently use a pricing program to estimate the cost to repair covered damage.  The pricing program contains information on per-unit costs for supplies and labor in the area.  (*Id.* at ¶ 23).  After preparing the estimates, the adjuster submits it, with the claim, to the WYO insurer.  If the WYO insurer approves the estimate, the amount is submitted to the policyholder as a "final settlement."  The policyholder may accept the final settlement or object to it.  Once the policyholder and the WYO insurer agree on a final settlement for a claim under an NFIP-backed policy, the insurer submits it to the NFIP for payment.  The NFIP reviews the claim and, if the claim is accepted, sends payment to the WYO insurer.  (*Id.* at ¶ 24).

The NFIP does not back wind-insurance policies.  A property owner typically purchases wind insurance from the same private insurer that administers the owner's NFIP flood policy.  The result is that when a home is damaged, the WYO insurer is responsible for evaluating claims under both policies, determining whether to attribute the damage to water or to wind, and providing an estimated value for each type of claim and damage.  The federal government pays for covered damage caused by flooding, and the private insurance companies pay for covered damage caused by wind.  Higher flood claims benefit WYO insurers because the adjuster fee the NFIP pays the insurer is based on the value of the claim, and attributing more damage to the flood policy may lower the amounts claimed under the privately backed wind-insurance policy.  Improperly classifying wind damage as flood damage or inflating flood-damage claims to minimize wind-damage claims is referred to as "wind/water fraud."

**B.      Kermith Sonnier**

Sonnier is an independent adjuster who has worked for several insurance companies, including some of the defendants.  He prepared property-damage estimates after Hurricane Katrina in 2006 and Hurricane Ike in 2008.  Sonnier reviewed an estimate Allstate had prepared in 2006 that assigned higher margins for overhead and profit on the flood claim under an NFIP-backed policy than on the wind claim under an Allstate-backed policy. (Complaint, ¶¶ 66–67).  That led Sonnier to investigate other claims he had worked on after Hurricane Ike.  He alleges that this investigation revealed that the defendant insurers routinely used higher per-unit prices to calculate flood claims than to calculate wind claims.  (*Id.* at ¶ 67).

In 2009, Sonnier filed a *qui tam* action against Allstate in the United States District Court for the Middle District of Louisiana, alleging wind/water fraud.  *See United States ex rel. Sonnier v. Allstate Ins. Co*, No. 09-1038-JJB, 2012 WL 75041 (M.D. La. Jan. 10, 2012) ("Sonnier I").  The court dismissed that lawsuit in January 2013 under the FCA's first-to-file rule, 31 U.S.C. § 3730(b)(5), because a similar *qui tam* action was pending when Sonnier sued.  *Id*.  When the first case was disposed of, Sonnier filed this second *qui tam* suit, again alleging wind/water fraud.

**C.      The Defendants**

Fourteen of 23 defendants have settled and been dismissed.  The remaining defendants are:

- Allstate Insurance Company,
- Brown & Brown,
- Colonial Claims,
- Fidelity National Financial,
- Fidelity National Indemnity Insurance Company,
- Louisiana Farm Bureau Casualty Insurance Company,
- Pilot Catastrophe Services,
- Southern Farm Bureau Casualty Insurance Company, and
- WRM America Holding Company.

**1.      The Insurers**

The corporate relationships among the defendant insurers are as follows:

• Allstate Insurance Company ("Allstate") is the subsidiary company of Allstate Corporation, which was voluntarily dismissed.  (Docket Entry Nos. 89, 116).

• Fidelity National Indemnity Insurance Company is a subsidiary of Fidelity National Financial, which provided NFIP-backed flood insurance through this subsidiary until November 2011, when the parent was acquired by WRM America Holding Company. (Docket Entry No. 99).  Fidelity National Financial, Fidelity National Indemnity Insurance Company, and WRM America Holding Company are collectively referred to as "Fidelity."

• Southern Farm Bureau Casualty Insurance Company, which includes Farm Bureau companies from seven states, provides flood insurance on behalf of the NFIP and services flood-insurance policies for its Farm Bureaus.  (Docket Entry No. 95).  Louisiana Farm Bureau Casualty Insurance Company ("Louisiana Farm Bureau") is one of the seven Farm Bureau companies that make up the Southern Farm Bureau Insurance Company.  Both Southern Farm Bureau Insurance Company and Louisiana Farm Bureau are referred to as "Southern Farm Bureau."

### 2.    The Adjusters

The relationships between the remaining defendant adjusters are as follows:

• Colonial Claims is an independent claim-adjusting services company that provided adjusting services to some of the defendant insurers.  In December 2011, Brown & Brown acquired Colonial Claims.  (Docket Entry Nos. 73, 74).

• Pilot Catastrophe is an independent claims-adjusting company that provided adjusting services to Allstate during the relevant period.  (Docket Entry No. 94).

### D.    The Allegations

Sonnier alleges that the defendants engaged in a widespread overpricing scheme, inflating flood-insurance claims to decrease wind-insurance claims.  He attached seven "representative examples" of the alleged fraud to his original complaint.  The examples refer to claim estimates for seven homes in Texas, Louisiana, and Mississippi damaged between 2006 and 2008.  The homes carried NFIP-backed flood insurance administered by Allstate, Farmers, Fidelity, Louisiana Farm Bureau, and Travelers.  The estimates were prepared by Colonial Claims, Pelican State Adjusters, and Pilot Catastrophe.  Sonnier also attached separate estimates he prepared using a program called "Xactimate."  Sonnier alleges that the examples show that the defendants deliberately inflated the flood claims.  The examples he alleges are described below:

- Travelers, using Colonial Claims as its adjuster, estimated flood-damage costs for removing and replacing drywall and painting for a home in Bridge City, Texas as $2.10 per unit for drywall and $0.87 per unit for painting.  (Docket Entry No. 1, Ex. 1).  Using Xactimate, Sonnier estimated that the costs should have been $0.62 and $0.61, respectively.  (Docket Entry No. 1, Ex. 2).

- Fidelity, using Colonial Claims as its adjuster, estimated flood-damage costs for repairing and replacing gypsum drywall for a home in Galveston, Texas as $1.96 per unit, and the repainting cost as $0.70 per unit.  (Docket Entry No. 1, Ex. 3).  Sonnier's Xactimate estimate for a home in nearby Crystal Beach, Texas showed that these costs were $1.58 and $0.37, respectively.  (Docket Entry No. 1, Ex. 4).

- Farmers, using Colonial Claims as its adjuster, estimated flood-damage costs for repairing and replacing drywall for a home in Bridge City, Texas as $1.86 per unit and the repainting cost as $1.10 per unit.  (Docket Entry No. 1, Ex. 5).  Sonnier's Xactimate estimate for the same address estimated these costs as $1.44 and $0.70, respectively.  (Docket Entry No. 1,

Ex. 6).

- Louisiana Farm Bureau, using Pelican State Adjusters as its adjuster, estimated flood-damage costs for repairing and replacing drywall for a home in Lake Charles, Louisiana as $2.05 per unit and the repainting cost as $0.87per unit.  (Docket Entry No. 1, Ex. 7).  An Xactimate estimate Sonnier prepared for a home on another street in Lake Charles showed these costs as $1.32 and $0.55, respectively.  (Docket Entry No. 1, Ex. 8).

- Allstate's flood-damage estimate for a home in Slidell, Louisiana listed $1.68 as the unit cost to remove and replace drywall, and $0.56 as the unit cost to repaint the walls.  (Docket Entry No. 1, Ex. 9).  For a home on another street in Slidell, Allstate's wind-damage estimate listed the drywall costs as $0.55 and the repainting costs as $0.33.  (Docket Entry No. 1, Ex. 10).  Allstate included a 49 percent overhead and profit charge on the flood-damage estimate, but charged only 31 percent for overhead and profit on the wind-damage estimate.  (Docket Entry No. 1, Exs. 9, 10).  Pilot Catastrophe acted as Allstate's adjuster for these estimates.  (Complaint, ¶ 103).

- Allstate's flood-damage estimate for a home in Ocean Springs, Mississippi listed the cost to repair and replace drywall as $1.53 per unit and the cost to repaint as $0.56 per unit.  (Docket Entry No. 1, Ex. 11).  Sonnier alleged that Allstate would have used unit costs of $0.76 and $0.31, respectively, on wind-insurance claims under the same policies.  (Complaint, ¶¶ 93, 95).

### D.    The Motions to Dismiss

The defendants have moved to dismiss Sonnier's claims.  They argue that the court lacks subject-matter jurisdiction over Sonnier's claims because he is not an original source; he was not the first to file; and he did not plead fraud with sufficient particularity.

Allstate and Pilot Catastrophe additionally argue that *res judicata* bars Sonnier's claims against them.  (Docket Entry Nos. 84, 88).  Fidelity argues that Sonnier did not state a claim because Fidelity did not issue the flood-insurance  policies on the relevant properties.  (Docket Entry No. 85).  Colonial Claims and Brown & Brown argue that Sonnier lacks standing to sue them and has not stated a claim because they neither issued the policies nor succeeded to them when Colonial Claims acquired the company that did issue them.  (Docket Entry No. 86).

Sonnier attached a declaration to his response to the motion to dismiss, outlining additional examples of alleged overcharging by the defendants.  The additional examples contain similar comparisons of flood claims with either wind claims or Xactimate estimates.  (Docket Entry No. 106, Ex. A).

Each ground for dismissal is analyzed under the applicable law.

## II.    The Legal Standards

### A.    Rule 12(b)(1) and Rule 56

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation and internal quotation marks omitted). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  "Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

When examining a factual challenge to subject-matter jurisdiction, which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (citation and internal quotation marks omitted); *see also Clark*, 798 F.2d at 741. "In deciding a motion to dismiss[,] the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996)). The court may consider matters outside the pleadings, such as testimony and affidavits, to resolve a factual challenge to subject-matter jurisdiction, without converting the motion to dismiss to one for summary judgment. *See Garcia*, 104 F.3d at 1261; *Olivier v. Kelly*, 2012 WL 4207301, at *2 (W.D. La. Aug. 31, 2012) ("Under Rule 12(b)(1), a court has wide discretion to review affidavits, and other documents outside of the pleadings . . . to resolve disputed jurisdictional facts. In such instances, a court's reference to evidence outside of the pleadings does not convert the motion to a Rule 56 summary judgment motion." (citing *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995))). But when the factual challenge does go to the merits, the motion is properly treated as one for summary judgment. "A challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011) (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004)).

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in favor of the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**B.**    **Rule 12(b)(6) and Rule 9(b)**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be

granted." FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which

requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.

R. CIV. P. 8(a)(2); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly,* 550

U.S. 544, 555 (2007).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts

to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "[T]he pleading

standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than

an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  "Factual

allegations must be enough to raise a right to relief above the speculative level, on the assumption

that all allegations in the complaint are true (even if doubtful in fact)." *Id.*

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

"Malice, intent, knowledge, and other condition of mind of a person may be alleged generally." *Id.*

Although the particularity Rule 9(b) demands differs with each case, "a plaintiff pleading fraud must

set forth the who, what, when, and where before access to the discovery process is granted.

Anything less fails to provide defendants with adequate notice of the nature and grounds of the

claim." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (quotations and citations

omitted); *accord United States ex rel. Steury v. Cardinal Health, Inc. (Steury II)*, 735 F.3d 202, 204

(5th Cir. 2013).  Rule 9(b) has four purposes: to ensure that the defendant has sufficient information

to formulate a defense by having notice of the conduct complained of; to protect defendants against

frivolous suits; to eliminate fraud actions in which all the facts are learned after discovery; and to

protect defendants from undeserved harm to their goodwill and reputation.  *See Harrison v.*

*Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  Rule 9(b) must be interpreted

and applied in light of these purposes.

"'[C]laims brought under the FCA must comply with the particularity requirements of 9(b) for claims of fraud." *Steury II*, 735 F.3d at 204 (quoting and altering *United States ex rel. Steury v. Cardinal Health, Inc. (Steury I)*, 625 F.3d 262, 266 (5th Cir. 2010)). While FCA claims must comply with Rule 9(b)'s pleading requirements, "[i]n contrast to common-law fraud, the FCA "lacks the elements of reliance and damages." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009). "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id.* "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act [§ 3729(a)(1)(A)] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. To plead with the requisite particularity a § 3729(a)(1)(B) claim, the complaint need not "allege details of fraudulent bills actually presented to the government." *Id.* at 192. The relator must, however, allege facts showing that "the defendant made a false record or statement [material to] a false or fraudulent claim paid by the Government." *Id.*; *see also* 31 U.S.C. § 3729(a)(1)(B).

## III.    Analysis

The FCA "permits, in certain circumstances, suits by private parties on behalf of the United States against anyone submitting a false claim to the Government." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 941 (1997). The Act attempts to balance the "promot[ion of] private citizen involvement in exposing fraud against the government" against the "prevent[ion of] parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *Reagan*, 384 F.3d at 174.

The FCA limits the subject-matter jurisdiction of courts adjudicating *qui tam* actions under the FCA. If the relator's suit is based on earlier public disclosures of the same allegations, the courts have no jurisdiction over that suit. The statute states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, of from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (pre-2010 amendment).[3]  The public-disclosure bar is to prevent "parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud" or only seek to benefit the government by disclosing information that is already publicly known. *Jamison*, 649 F.3d at 332 (quoting *Reagan*, 384 F.3d at 174); *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 381 (5th Cir. 2009). If a relator is not an original source but brings a FCA suit based on an earlier public disclosure, a district court generally lacks subject-matter jurisdiction over the suit. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68 (2007).

A court asks three questions to determine whether a public disclosure bars an FCA suit:

(1) Was there a "public disclosure" of the allegations or transactions?

(2) Was the *qui tam* action "based upon" what was publicly disclosed?

(3) If so, was the relator an "original source" of the information that forms the basis of the complaint?

*Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995). An "original source"

---

[3] The FCA's public-disclosure bar was amended effective July 22, 2010. Pub. L. No. 111-148, 124 Stat. 119, 901. The amendments do not apply to allegations of conduct before that date. *See United States ex rel. Lockey v. City of Dallas, Tex.*, No. 3:11-cv-354, 2014 WL 268371, at *5 (N.D. Tex. Jan. 23, 2013).

is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B).

### A.   Was There a Public Disclosure of the Alleged Wind/Water Fraud?

The potential for wind/water fraud has been the subject of numerous public disclosures.  In 2005 and 2006, Robert Hunter, a former FEMA Federal Insurance Administrator, testified in congressional hearings about the conflict of interest created by the structure of the WYO program, and the possibility that private insurers would overestimate flood damage and underestimate wind damage to shift losses the insurers would have to pay to the federal government.[4]   Hunter recommended that the Government Accountability Office ("GAO") audit WYO insurers' claims for wind and flood damage.[5]

In June 2006, Congress held additional hearings on possible wind/water fraud.  United States Representative Gene Taylor accused WYO insurers of altering wind and flood claims so that they "assigned all of the claim to flooding."[6]  He claimed that "the insurance industry made a corporate decision to, whenever possible, blame flooding every time and stick the taxpayers with bills that

---

[4] *See* Hearing on the Nat'l Flood Ins. Program Before the S. Comm. on Banking, Housing and Urban Affairs, 2005 WL 2661294 (Oct. 18, 2005) (statement of Robert Hunter, Director of Insurance, Consumer Federation of America); Hearing on the Nat'l Flood Ins. Program Before the S. Comm. on Banking, Housing and Urban Affairs, 2006 WLNR 1848600 (Feb. 2, 2006) (statement of Robert Hunter, Director of Insurance, Consumer Federation of America).

[5] *See* Hearing on the Nat'l Flood Ins. Program Before the S. Comm. on Banking, Housing and Urban Affairs, 2006 WLNR 1848600 (Feb. 2, 2006) (statement of Robert Hunter, Director of Insurance, Consumer Federation of America) ("[I]t is essential that the government assure a fair and proper allocation of the wind/flood damage by the WYO insurance companies who have a serious conflict of interest. CFA urges this Committee to insure that the GAO audits these allocations starting right now, so that any tendency of the insurers to diminish their wind losses for their own benefit is stopped quickly.").

[6] Waste and Fraud in the Aftermath of Hurricane Katrina: Hearing Before the Subcomm. on Investigations of the H. Comm. on Homeland Security, 109th Cong. 83–84 (2006) (statement of Rep. Gene Taylor).

the[ insurers] should have paid."  Representative Taylor introduced a proposed amendment to the

Flood Insurance Reform and Modernization Act of 2006, to require the Office of Inspector General

of the Department of Homeland Security ("OIG") to investigate possible cases of wind/water fraud.[7]

In July 2006, the Senate passed legislation requiring the GAO and the Office of Inspector

General ("OIG") of the Department of Homeland Security, to determine whether "insurers . . .

improperly attributed damages from [Hurricane Katrina] to flooding covered under the [NFIP] rather

than to windstorms covered under coverage provided by such insurers."  Dep't of Homeland Sec.

Appropriations Act of 2007, 152 Cong. Rec. S7632 at S7633 (2006).  The GAO issued a report in

December 2007, and the OIG issued a report in 2008.[8]

The media has also widely reported allegations of wind/water fraud and the insurance

industry's incentive to overstate flood claims and understate wind claims.[9]  Media reports have

discussed the WYO insurers' conflict of interest, allegations that WYO insurers improperly inflated

prices on flood claims, and the federal government's refusal to act.  The reports also discussed

specific allegations that WYO insurers had improperly inflated flood-claim amounts by "charging

---

[7] Flood Insurance Reform and Modernization Act of 2006, 152 Cong. Rec. H4589-02, at H4603 (2006) (statement of Rep. Taylor).

[8] *See* GAO Oversight Report at 2, (Docket Entry No. 87, Ex. 45); Office of Inspector Gen., Dep't of Homeland Sec., OIG-08-97, Hurricane Katrina: Wind Versus Flood Issues 1 (2008) ("OIG Katrina Report").

[9] *See, e.g.*, Rebecca Mowbray, *Review to look at wind vs. water: Label of damage by insurers is key*, TIMES-PICAYUNE, May 19, 2006, at 1; Rebecca Mowbray, *GAO Report warns of insurer bias on flood claims, recommends reforms*, TIMES-PICAYUNE, Jan. 31, 2008, at 1–2 (reporting that FEMA continued to reject the notion that it "need[ed] wind information to adequately oversee the program" because FEMA asserted that "there's no proof that wind and flood damages were handled inappropriately," and FEMA "fe[lt] that the existing means of auditing and managing the National Flood Insurance Program and write-your-own insurers are sufficient"); Rebecca Mowbray, *Same house. Same repairs. Same insurer. Why different prices? Evidence suggests Allstate pays far more for flood repair than for wind damage. The reason? The government picks up the flood tab, and the company minimizes its own payout*, TIMES-PICAYUNE, May 20, 2007; Ryan Denham, *How State Farm fought through the second storm*, PANTAGRAPH, Aug. 22, 2010, at 2; Jesse A Hamilton, *Whistleblower Claim Against Allstate Accuses Company of Cheating Flood Program*, BESTWIRE, Sept. 29, 2010.

the National Flood Insurance Program one set of prices for repairs, while the company paid different prices for the same materials in the same house."  Anita Lee, *State Farm trial begins Monday: Pass Christian resident suing*, SUN HERALD,  June 2, 2007, at 2, (Docket Entry No. 87, Ex. 57).[10]

Prior *qui tam* suits have also disclosed specific instances of wind/water fraud.  The examples the parties cite are set out below:

• In *United States ex rel. Rigsby v. State Farm Ins. Co. et al.*, No. 1:06-cv-433 (S.D. Miss., filed April 26, 2006) relators Cori and Kerri Rigsby claimed that Allstate and other WYO insurers "made a corporate decisions to misdirect and misallocate claims from those of hurricane coverage . . . to flood claims that could be submitted and paid directly from the United States Treasury."  (Docket Entry No. 87, Ex. 1, Complaint, ¶ 33).  They alleged that the insurers "insisted that adjusters 'hit limits' when adjusting flood claims" by using an estimating program called "XACT Total."  (*Id.* at ¶¶ 37–38).

• In *United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co. et al.*, No. 2:06-cv-4091 (E.D. La., filed August 2, 2006), the relator  alleged that insurers, including Allstate, "grossly exaggerat[ed] losses by using inflated prices in the adjustments and by including items in the adjustments that did not need to be replaced." (Docket Entry No. 87, Ex. 23, Second Amended Complaint, ¶ 17).  The relator alleged that "by overstating flood damage, defendants were able to significantly increase the amount of fees they received from [the federal government] for processing and adjusting claims.  (*Id.*).

• In *United States ex rel. Denenea v. Allstate Ins. Co.*, No. 2:07-cv-2795 (E.D. La., filed May

_____

[10] *See also* Mowbray, *Same house. Same repairs. Same insurer. Why different prices? Evidence suggests Allstate pays far more for flood repair than for wind damage. The reason? The government picks up the flood tab, and the company minimizes its own payout*, (Docket Entry No. 87, Ex. 55).

4, 2007), relator John Denenea, Jr. claimed that Allstate had inflated flood-insurance claims by "knowingly estimat[ing] . . . losses utilizing substantially inflated replacement cost values for items comprising their flood insurance claims . . . while at the same time enriching Allstate by substantially deflating replacement cost values for identical items comprising their [wind] insurance claims."  (Docket Entry No. 87, Ex. 21, First Amended Complaint, ¶ 12).

- In *United States ex rel. Freeman v. State Farm Fire & Cas. Co*, No. 2:07-cv-2963 (E.D. La, filed May 18, 2007), relator James Freeman claimed that WYO insurers had "fraudulently characteriz[ed] the damages caused by wind as 'flood damage.'"  (Docket Entry No. 87, Ex. 8, Complaint, ¶ 32).

- In *United States ex rel. Sonnier v. Allstate Ins. Co. et al*, No. 09-1038-JJB, 2012 WL 75041, at *3 (M.D. La., filed Jan. 10, 2012), Sonnier made allegations against Allstate similar to those asserted here.  Sonnier alleged that Allstate "deliberately allocated higher unit prices on the NFIP flood insurance claims (for which it received reimbursement dollar for dollar from the federal government) than in the loss estimates prepared in response to wind claims (which were paid directly by ALLSTATE with its own funds) despite the claims arising from the same insured property for damage or loss caused at the same time and by the same disaster."  (Docket Entry No. 87, Ex. 22, Complaint, ¶ 29).

Sonnier admits that there were public disclosures of the alleged fraud through congressional hearings, government reports, media coverage, and prior *qui tam* suits.  But Sonnier argues that his own prior suit filed in Louisiana is not a "public disclosure" under the FCA that would trigger the bar.

Under the FCA, allegations disclosed in a "criminal, civil, or administrative hearing" invoke

17

the public-disclosure bar.  31 U.S.C. § 3730(e)(4)(A).  There is no exception for a relator's own prior public disclosures, including a lawsuit.  The Fifth Circuit has held that "[a]ny information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for the purposes of section 3730(e)(4)(A)," which "includes civil complaints."  *Fed. Recovery Servs.*, 72 F.3d at 450.  In *Reagan*, a relator's earlier state-court suit was a public disclosure that barred her later federal *qui tam* action.  *Reagan*, 384 F.3d at 174.  Other circuits agree.  *See U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 114 (1st Cir. 2010) (the public-disclosure bar applied to the relator's allegations, which were "just a slightly more detailed version of a prior allegation" in an earlier *qui tam* suit the relator had filed); *In re Natural Gas Royalties*, 562 F.3d 1032, 1040 (10th Cir. 2009) (a similar *qui tam* suit that the same relator filed two years earlier was a public disclosure of the allegations); *see also U.S. ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 333 (6th Cir. 1998) (noting that "several courts have rejected the contention that a person's *qui tam* action cannot be considered 'based upon' that same individual's prior public disclosure").

This result is consistent with the purpose of the public-disclosure bar: to prevent "parasitic suits" that do not benefit the government.  *Reagan*, 384 F.3d at 174.  "[A] *qui tam* suit does not benefit the Government if the information about the fraud is already publicly known."  *Branch*, 560 F.3d at 381.  "Any unfairness of this rule with regard to a *qui tam* plaintiff who was the source of the public disclosure is mitigated by the fact that a plaintiff in this position still would have the opportunity to maintain [his or] her suit if [he or] she qualified as an 'original source.'"  *Jones*, 160 F.3d at 333.

The allegations in the earlier *qui tam* action Sonnier filed in Louisiana were "public disclosures" under the FCA.  The disclosures included allegations in his Louisiana suit that WYO

18

insurers and their adjusters had a conflict of interest in administering WYO flood-insurance policies and in adjusting and evaluating claims; that insurers and adjusters fraudulently inflated the flood claims under NFIP-backed policies by using higher per-unit price estimates and assigning higher margins of overhead and profit on flood claims than on wind claims. The Louisiana suit alleged that the insurers and adjusters inflated the flood claims to increase the fees they received and to "max out" the flood-damage claims and thereby pay less under the wind-insurance policies covering the same properties. These same allegations — including claims of per-unit price inflation — were earlier disclosed in the media and in other *qui tam* suits.[11]

### B.      Is this FCA Suit "Based Upon" the Earlier Public Disclosures?

Sonnier concedes that his allegations in the present suit are "based upon" the prior disclosures of wind/water fraud. (Docket Entry No. 106, Hearing Tr., at 7). Within the Fifth Circuit, the test is satisfied if the complaint is "even partly based upon public allegations or transactions," *Stennett v. Premier Rehab., LLC*, 479 Fed. App'x 631, 635 (5th Cir. 2012). Precisely repeating a prior public disclosure is not required.[12]  Sonnier concedes that his allegations are

---

[11] *See* Mowbray, *Same house. Same repairs. Same insurer. Why different prices? Evidence suggests Allstate pays far more for flood repair than for wind damage. The reason? The government picks up the flood tab, and the company minimizes its own payout*, (Docket Entry No. 87, Ex. 55); (Docket Entry No. 87, Ex. 23, Branch Second Amended Complaint, ¶ 17); (Docket Entry No. 87, Ex. 21, Denenea First Amended Complaint, ¶ 12).

[12] The majority of circuits consider that "a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (collecting cases). *See also United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir. 1992); *United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh*, 186 F.3d 376, 388 (3d Cir. 1999); *Fed. Recovery Servs.*, 72 F.3d at 451; *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997); *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1047 (8th Cir. 2002); *United States ex rel. Biddle v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 161 F.3d 533, 537 (9th Cir. 1998); *United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1171–72 (10th Cir. 2007); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 684–85 (D.C. Cir. 1997). The Fourth Circuit is in the minority and only considers a suit to be "based upon" prior disclosures only if "the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based." *United States ex rel*

substantially similar to the claims of wind/water fraud that were disclosed in prior lawsuits, media reports, Congressional hearings, and government investigations.  (Docket Entry No. 126, Motion Hearing Tr. at 7).  His complaint makes the same allegations those earlier disclosures described, against many of the same companies.  His allegations are "based upon" the public disclosures.

### C.    Is Sonnier an "Original Source"?

Because Sonnier's complaint is based on public disclosures, it is barred unless he is an original source.  *See* 31 U.S.C. § 3730(e)(4)(A).  To be an original source, the relator must have "direct and independent knowledge of the information on which the allegations are based," and must "voluntarily provide[] the information to the Government before filing his or her *qui tam* action."  *Reagan*, 384 F.3d at 177.

Sonnier alleges that on March 30, 2012, he provided the government the information on which he bases the allegations.  That date is ten days before he filed his complaint.  (Complaint, ¶ 112; Docket Entry No. 106, at 40–41).  The issue is whether Sonnier had direct or independent knowledge of the information.  *Rockwell*, 549 U.S. at 472.  He need not "be an original source of every detail, [but] must have direct and independent knowledge of the core information underlying [the] allegations."  *U.S. ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 277 (E.D. La. 2011).

A relator's knowledge is "direct" if it is "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003) abrogated on other grounds by *Rockwell*, 549 U.S. at 457.  A relator's knowledge is "independent"

---

*Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1237–48 (4th Cir. 1994).

if "it is not derived from the public disclosure." *U.S. ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 797 (E.D. La. 2009). "Although the relator need not show that he knew about the fraud before the public disclosures, his prior knowledge of the information, upon which he based the complaint, may help demonstrate that he obtained the information independent of the public disclosure." *Stennett*, 479 Fed. App'x at 635 (citing *Branch*, 668 F. Supp. 2d. at 801–02). Courts must "look to the factual subtleties of the case . . . and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *Reagan*, 384 F.3d at 177 (quoting *Laird*, 336 F.3d at 356).

Sonnier alleged and provided evidence that he had direct knowledge of the information underlying his allegations. He alleged that he learned of the fraud through his own investigation using nonpublic estimates he obtained working as an adjuster. But Sonnier's knowledge was not independent of the public disclosures. Knowledge of information that has already been publicly disclosed cannot be converted to "'direct and independent knowledge' simply because the plaintiff discovered through investigation or experience what the public already knew." *Reagan*, 384 F.3d at 179. Rather, the relator's investigation "either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed." *Id.* at 179 (citing *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 568 (11th Cir. 1994)).

"The burden is on the Relators to show that the information and allegations they discovered were qualitatively different information than what had already been discovered and not merely the product and outgrowth of publicly disclosed information." *United States ex rel. Lockey v. City of*

21

*Dallas*, 576 Fed. App'x 431, 437 (5th Cir. 2014) (quoting *Fried*, 527 F.3d at 443). If the relator's investigation did not result in information that is "qualitatively different from the information that had been placed in the public domain by the disclosures," it is not independent. *Branch*, 668 F. Supp. 2d at 797.

In *Branch*, 668 F. Supp. 2d at 780, the relator alleged wind/water fraud similar to the pattern Sonnier claims. The relator, Branch, a consulting group, had examined hundreds of properties covered by NFIP-backed policies in Louisiana, and had determined the actual flood damage on each property. *Id.* at 786. Branch compared the actual flood-damage amounts to the amounts of the flood claims the NFIP paid. The comparison showed that the claims WYO insurers submitted fraudulently overstated the amount of damage. *Id.* Although there had been earlier investigations into the possibility of wind/water fraud, Branch alleged "qualitatively different information" from what had been disclosed before. *Id.* at 797. These earlier disclosures, "while sufficient to notify the government of the potential for fraud, consist[ed] of unsubstantiated accusations and generalized suspicions of fraud, as well as basic descriptions of the possibility, opportunity, and incentives for the WYO insurers to shift their costs onto the government." *Id.* at 798. But the prior disclosures supplied "exceedingly few specifics to support the abstract outline of the fraudulent scheme they allege[d]." *Id.* Branch's investigation "provided a host of 'additional compelling facts' about the fraud that were nowhere previously available." Branch was therefore an original source. *Id.* at 801 (quoting *Reagan*, 384 F.3d at 179).

In *U.S. ex rel. Farmer v. City of Houston*, No. H-03-cv-3713, 2005 WL 1155111, at *1 (S.D. Tex. May 5, 2005), the relator alleged that the defendants, the City of Houston and the Houston Area Urban League ("HAUL"), were inflating the amount of materials needed to repair houses under a program financed by the federal Department of Housing and Urban Development ("HUD"). The

relator relied "heavily" on public information, but gathered information to support her allegations through her own efforts. *Id.* at *5. After observing that HAUL had inflated the amount of materials needed to repair her own roof, she compared the disbursements to HAUL with her own estimates of costs calculated from public records about the other houses that HAUL had repaired. Her investigation "demonstrated a new and undisclosed relationship between disclosed facts and put HUD 'on the trail' of fraud. *Id.* (quoting *Reagan*, 384 F.3d at 179). "[P]rior to Relator's effort, there ha[d] never been an examination of HAUL's alleged overcharging practice." *Id.* "Because this review resulted from Relator's efforts, she is the original source of the information underlying her claims." *Id.*

In *Lockey*, 576 Fed. App'x at 433, the relators alleged that the City of Dallas and the Dallas Housing Authority were not complying with their obligations to "affirmatively further fair housing," a condition of receiving HUD funds. The relators learned the information underlying their allegations from their involvement in a low-income housing project proposal that the City of Dallas had rejected. The relators also relied on "a fifteen-month investigation that involved compiling data and performing analyses of [Dallas Housing Authority] properties, Low-Income Housing Tax Credit project locations, and City plans and reports." *Id.* The relators had no direct interactions with the housing authority. *Id.* The Fifth Circuit found that while some of the information on which the allegations were based derived from the relators' personal experiences, most of the complaint allegations arose from the relators' investigation into publicly disclosed information. *Id.* at 436. "It was already extensively alleged through public disclosures that the City and [housing authority] were failing to live up to their obligations. . . . Allegations such as those made by Relators were publicly disclosed, among other places, in news articles, in the long-running *Walker* litigation, . . . and in a review of the City's actions by the Texas Affordable Housing Project." *Id.* at 437.

23

Although the relators' investigation was independent, it merely "produced information that mirrored the prior publicly disclosed allegations."  The relators were not original sources.  *Id.*

In *Jamison*, 2010 WL 1276712, at *9, the relator worked in the medical-equipment business. He alleged that hundreds of defendant nursing homes and medical-equipment suppliers had entered into "illegal joint ventures" to obtain referrals and increase revenue from Medicare Part B.  The relator had not worked for the defendants and had not reviewed their internal documents.  *Id.* at *12. He nonetheless contended that the information he gained from his professional experience and his independent investigation of the defendants made him an original source for his fraud allegations. *Id.*

The relator's independent investigation involved obtaining information from unnamed employees of the defendants, visiting the defendants' offices, and requesting and reviewing reports from the Mississippi Division of Medicaid.  But the relator admitted that he discovered the relationship between the defendants by looking through documents publicly available on government websites.  *Id.* at *13.  The relator argued that he was still an original source because his investigation had uncovered the "manner in which these entities were engaged in a joint venture." *Id.*  The district court rejected this argument.

The court found that "[e]very aspect of the contractual joint ventures between [the defendants] was well known — including its potential for abuse."  *Id.*  The district court held that the relator had not met his burden of showing that his knowledge was direct because his allegations were based on knowledge that was almost entirely second-hand, including "research and review of public records" and "second-hand interviews" with the defendants' employees.  *Id.*  The Fifth Circuit affirmed, holding that the relator was not an original source because his complaint "merely listed a large group of possible defendants, without identifying specific allegations about any

particular one," and provided only a "general description of the fraud and an arbitrary list of many

of the [medical-equipment] suppliers and nursing home operators in Mississippi." *Jamison*, 649

F.3d at 332.

The case of *Fried*, 527 F.3d at 443, involved the "last-day exemption program," used by

many Texas school districts to make employees who were otherwise ineligible entitled to receive

Social Security benefits.  The last-day program was the subject of a GAO inquiry and report,

congressional hearings, and media coverage.  *Id.*  The relator investigated a particular school

district's use of the program by talking to the district's business manager and posing as a teacher.

*Id.*  His investigation revealed that the school district used the last-day program to make its

employees eligible for Social Security benefits.  Through his investigation, the relator also learned

how many hours an employee would have to work in the last-day program to obtain Social Security

benefits.  *Id.*

The Fifth Circuit held that the relator's knowledge was not direct and independent.  He

"merely received information about a program that had been publicly disclosed and hotly debated."

*Id.*  The fact that the relator discovered that the school district was among those districts using the

program and the "manner in which the [fraudulent program] was being implemented" in a particular

school district did not show that his allegations were based on "'qualitatively different information

than what had already been discovered' and not merely the 'product and outgrowth' of publicly

disclosed information."  *Id.* (quoting *Federal Recovery Servs.*, 72 F.3d at 452).

Sonnier argues that he has contributed to uncovering fraud because he discovered from

investigating nonpublic documents that the defendants "systematically overcharged for contractor

O&P and material and labor costs on flood claims."  (Docket Entry No. 106 at 36).  He asserts that

he did not know some of the public disclosures of wind/water fraud allegations and relied on none.

(*Id.* at 48–49).  But Sonnier has conceded, and the court has found, that his allegations in this suit are based upon the earlier public disclosures of wind/water fraud and that they bear significant similarities to these prior public disclosures.

The record does not show that Sonnier, by his own efforts, contributed new or "qualitatively different" information from what had already been publicly disclosed.  At best, Sonnier's investigation uncovered specific occurrences of what the public already knew: that insurers and adjusters had incentives and opportunities to inflate flood claims and did so in specific cases, including by manipulating the unit prices.  Both *Branch* and *Denenea* involved alleged unit price inflation.  The media reports were similar.

Sonnier also included allegations of inflated overhead and profit margins in his complaint. These allegations were not previously disclosed, but they are not qualitatively different from the widespread previously disclosed allegations that insurers and adjusters overestimated flood-damage claims and underestimated wind-damage claims in various ways.  Even crediting Sonnier for uncovering the specific manner in which certain insurers and adjusters overstated flood as opposed to wind claims does not make Sonnier an original source.  *See Fried*, 527 F.3d at 443 (holding that the relator, who investigated and discovered the manner in which a particular school district implemented a widespread fraudulent scheme, was not an original source).

The fact that Sonnier included some defendants who had not been specifically mentioned in prior public disclosures does not make him an independent source.  The information underlying these allegations is not independent from the information already available about wind/water fraud. When, as here, an entire industry has been the subject of public disclosures alleging fraud, adding another defendant to the list does not make the relator an original source.  *See United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) ("Industry-wide

26

public disclosures [of fraud] bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures.")  Numerous examples of such practices were uncovered by earlier relators, and dozens of WYO insurers and adjusters were implicated.  The public disclosures sufficiently allowed the federal government to identify the additional defendants Sonnier names in this suit.  *See also Branch*, 668 F. Supp. 2d at 795 ("While there are numerous WYO insurers, the possible perpetrators of the fraud alleged in the complaint are identifiable because the government can ascertain the identities of the WYO insurers from its records.").

In summary, Sonnier's allegations are the product and outgrowth of the public disclosures on which they are based.  His specific allegations are not independent of those disclosures.  Because he is not an original source, Sonnier lacks standing to sue under the FCA.  Sonnier's lack of standing deprives this court of jurisdiction and makes it unnecessary to address the defendants' remaining arguments for dismissal.

## IV.   Conclusion

The defendants' motion to dismiss, (Docket Entry No. 82), is granted.  A dismissal order is separately entered.

SIGNED on January 29, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

27